645 P.2d 821

**McELHANEY CATTLE COMPANY, an Arizona corporation; S & V Cattle Company, an Arizona partnership; and Gary and Carol Oden, individually, Plaintiffs-Appellees,**

v.

**Alberta SMITH, in her capacity as Yuma County Assessor; Bill F. Walker, as Treasurer of Yuma County, Arizona; Yuma County, Arizona; and the Arizona Department of Revenue, Defendants-Appellants.**

No. 1 CA–CIV 4746.

Court of Appeals of Arizona,
Division 1, Department B.

March 3, 1981.

Rehearing Denied April 16, 1981.

Review Granted May 5, 1981.

Rolle, Jones, Benton & Cole by F. Keith Benton, Yuma, and Jennings, Strouss & Salmon by Charles R. Hoover, Neil Vincent Wake, K. Layne Morrill, Phoenix, for plaintiffs-appellees.

Robert K. Corbin, Atty. Gen. by James D. Winter, Asst. Atty. Gen., Phoenix, for defendants-appellants.

## OPINION

JACOBSON, Judge.

This case of first impression in Arizona requires the determination of whether the

cattle comprising the "inventory" of a commercial feedlot are exempt from taxation under the "wholesaler" exemption provided by Article IX, § 2 of the Arizona Constitution or the "manufacturer" exemption provided by Article IX, § 13 of the Arizona Constitution.

This action was filed by McElhaney Cattle Company (McElhaney), S & V Cattle Company (S & V) and Gary Oden and Carol Oden (Odens) (collectively referred to as the taxpayers) against the taxing authorities of Yuma County, and the Arizona Department of Revenue. The action sought a determination that feeder cattle owned by the taxpayers during 1975 were exempt from ad valorem taxation and in addition sought a refund for the additional taxes paid under protest because of the disallowance of their claimed exemption. This suit was filed after the Yuma County assessor had denied their claimed exemption and the assessor's action was upheld by the Yuma County Board of Equalization.

After trial, the trial court found that all three taxpayers were entitled to the claimed exemptions under either § 2 or § 13 of Article IX of the Arizona Constitution and that McElhaney and S & V were entitled to a refund of taxes paid under protest in the sum of $1,655.25 and $248.23, respectively. The trial court further found that the taxpayers Oden were not entitled to a refund as they had failed to pay the 1975 taxes under protest. Only the taxing authorities have appealed.

The taxpayers claim they are entitled to an exemption under either § 2 or § 13 of Article IX, of the Arizona Constitution. Section 2 provides, in part:

Stocks of raw or finished materials, unassembled parts, work in process or finished products constituting the inventory of a ... wholesaler located within the state and principally engaged in the resale of such materials, parts or products, whether or not for resale to the

ultimate consumer, shall be exempt from taxation.

Section 13 provides:

No tax shall be levied on raw or unfinished materials, unassembled parts, work in process or finished products constituting the inventory of a manufacturer or a manufacturing establishment located within the state and principally engaged in the fabrication, production, and manufacture of products, wares and articles for use, from raw or prepared materials, imparting thereto new forms, qualities, properties and combinations ....

The facts which the trial court found gave rise to an application of both of these constitutional provisions to the taxpayers' feeder cattle are that McElhaney is a corporation which operates a large commercial cattle feedlot in Yuma County, Arizona. Gary C. Oden is the president and general manager of McElhaney. S & V is a partnership comprised of Sam McElhaney and his wife, Vennie McElhaney. S & V was established as a separate partnership to engage in cattle owning and feeding, which partnership is separate and distinct from McElhaney. The Odens also own and feed cattle in their individual capacities.[1]

The McElhaney feedlot was established approximately 30 years ago and presently has a capacity of approximately 55,000 head of cattle. The feedlot has an inventory turnover of approximately 1.3 times per year, so that if it operated at capacity year-round, approximately 70,000 head of cattle would be processed through the feedlot. Because of line of credit limitations, the taxpayers at any given time are limited to feeding 20,000 to 25,000 head of cattle owned by them. Because of the fixed costs of the operation, significant economic savings per head of cattle can be achieved by operating the feedlot at full capacity. For this reason, feeder cattle owned by persons other than the taxpayers are fed at the McElhaney lot, thus reducing the taxpayers' unit cost for feeding their own cattle.

1. The taxing authorities, in their presentation before this court, have not attempted to distinguish among McElhaney, S & V and Odens, insofar as the legal principles applicable here are concerned. For this reason, this opinion shall treat all these taxpayers similarly.

The testimony indicated that this was the primary purpose for feeding other people's cattle. The taxpayers are only claiming exemption on cattle owned by them.

During the 30 years McElhaney has been in the feedlot business, significant technological and scientific developments have occurred in the preparation of cattle for ultimate human consumption. McElhaney's original operation consisted primarily of feeding the cattle hay, cottonseed hulls, grain and cottonseed meal. The only equipment used was a grinder and a wagon to deliver the feed to the cattle. The mixing of the feed was by hand. Under this type of operation, it took two to four years to prepare an animal for market.

The advances made in this business were basically in two areas, nutritional and genetic. On the nutritional front, scientists have isolated the various vitamins and nutrients which underly the metabolic process of the animal. Through research, some 12 or 13 different nutrients have been identified, their functional values determined, and various combinations developed which produce a given end effect in the animal. Among the scientific advances was the discovery of the compound glycogen, which develops the desired "marbling" qualities in meat (the presence of small flecks of fat between the muscle fibers). The marbling quality of meat is the primary standard utilized by the United States Department of Agriculture in grading a meat carcass as prime, choice, or a less desirable grade.

Thus, through the scientific combination of roughage, minerals, proteins, vitamins and additives in a feeder steer's diet, the desired end carcass can be achieved. In order to deliver this highly technical diet to the animal an elaborate and sophisticated system of machinery is now utilized. This consists of mixers, weighing systems, metering devices, electrical control systems, grain flaking equipment, bins and storage elevators.

On the genetic front, research has isolated the female hormone DES and other hormones which can develop the desired characteristics of beef for human consumption.

These hormones are either implanted in the steer's ear or mixed with the feed ration. The introduction of female hormones into the feeder steer is important because of the necessity to castrate bull calves (99% of the taxpayers' feeder cattle start as bull calves). Castration is necessary to avoid the heavy front shoulders and neck characteristics of bulls which produce undesirable cuts of meat. However, castration retards the potential rate of weight gain. The use of hormones offsets this loss of gain and allows the steers to "finish" at a more rapid rate than untreated steers. Also, hormones cause heavy development in the rear quarters of the animal, from which come the most desired cuts of meat.

As a result of these scientific and technological advances, the time necessary to produce a marketable animal of 1,000 to 1,100 pounds has been reduced from a period of two to four years to a period of approximately 200 days (starting with a 400 pound calf) or 300 days (starting with a 250 pound calf).

The animals that the taxpayers purchase for feeding, described as "range" or "pasture" calves, weigh between 250 and 400 pounds, have an extremely low fat content and glycogen level and are economically unmarketable for human consumption at time of purchase.

The breed, grade and weight of range calves purchased by the taxpayers are determined for their ultimate sale to the chain store market, such as Safeway. This market requires a "finished" animal which will produce a carcass weighing between 600 and 650 pounds, graded choice with a yield grade (the amount of marketable meat) of two or three (on a one to six scale where one is the highest yield grade).

As the result of the taxpayers' treatment, a substantial transformation of the range calf to the "finished" steer occurs. The shape and contour of the animal is changed, its weight is shifted from the shoulder and neck area to the loin and hip area, the meat has more marbling than occurs in nature and the meat has a more desirable taste. As the taxpayers' expert, Dr. William H. Hall, testified:

Yes, there have been changes in the morphology in the fact that the muscles are bigger, they are thicker; the back is covered over, and in the case of a bull, he's lost a bull appearance .... You would not recognize the animal in terms of the animal that was originally purchased.

In short, what is produced is an animal with a heifer form on a bull frame.

All of the range calves purchased by the taxpayers (with a minimal exception for home and friend consumption) are ultimately destined for resale, at wholesale, to meat-packers who sell to the chain stores.

The economics of the taxpayers' feedlot operation is that a profit is derived if the finished steer sells for more than the original cost of the animal, plus the expense of producing the finished animal. In this regard, for the years prior to 1973, the taxpayers' proceeds from the sale of steers exceeded their expenses. Following 1973, and in the year in question, because of adverse market conditions, the taxpayers, like other cattle feeders generally, suffered large losses on the sales of cattle raised. During this period, the amount of money received from other cattle owners whose cattle the taxpayers were feeding on the McElhaney lot exceeded the amount of losses suffered on the taxpayers' own cattle.

Charges to third parties for raising their cattle are based upon a fixed dollar fee per ton of feed used. This charge includes services provided and a flat markup of $20 per ton. The taxpayers "charge" themselves the same fixed fee in determining their profit or loss.

For federal income tax purposes, the taxpayers are considered "cattle feeders" engaged in selling steers to customers in the ordinary course of business; gain on the sale of animals is considered ordinary income, not capital gain, and no depreciation is allowed on the animals.

Based upon these facts, the trial court found that the cattle owned by the taxpayers in 1975 were exempt from taxation under the two provisions of the Arizona Constitution previously referred to. We first turn to a determination of whether the trial court's ruling can be justified under Article IX, § 2, which exempts from taxation the "raw" materials and "work in process" of "wholesalers."

The taxing authorities first urge that the evidence in this case must be viewed from the perspective that the presumption is against tax exemption and the burden is on the taxpayer to establish the right to the exemption. *See Conrad v. County of Maricopa,* 40 Ariz. 390, 12 P.2d 613 (1932); *Fry v. Mayor and City Council of Sierra Vista,* 11 Ariz.App. 490, 466 P.2d 41 (1970). From this premise, they argue that the tax exemptions involved here should be narrowly construed.

The taxpayers, on the other hand, contend that the stated purpose of these constitutional amendments was to encourage the greater industrial development of this state, thereby producing more jobs for more Arizona people and result in producing more revenue for the state. *See County of Apache v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 376 P.2d 854 (1962). From this premise, the taxpayers argue that the constitutional amendments should be liberally construed.

In the court's opinion, rules of construction, either liberal or restrictive, are not particularly helpful in resolving the issues involved. These constitutional amendments appear clear and unambiguous. Either the evidence established that the taxpayers were primarily engaged in the business of wholesaling (there is no contention by either party that the taxpayers are "retailers") and that the feeder cattle constitute either raw materials or work in process, or it did not.

The taxing authorities next argue that the taxpayers are not wholesalers. This argument is two-pronged. First, the argument is made that in ordinary parlance, a wholesaler is a merchant who buys and sells merchandise, and live cattle are not merchandise. No citation of authority is given for this proposition. In our opinion, neither the constitutional provisions nor "ordinary

parlance" requires such a restrictive definition.

"Wholesaler" is defined under the transaction privilege tax statutes (A.R.S. § 42–1301(24)), as "any person who sells tangible personal property for resale and not for consumption by the purchaser." This same statute defines "tangible personal property" as that "which may be seen, weighed, measured, felt, touched or is in any other manner perceptible to the senses." A.R.S. § 42–1301(21). We see no reason why this statutory definition of "wholesaler" is not equally applicable to define "wholesaler" in Article IX, § 2.

The fact that the inventory of the wholesaler is "alive" should not change the definition. A wholesaler who supplies pet shops with puppies, guppies, kittens and mice is no less a wholesaler simply because his merchandise is not inanimate.

The second prong of the taxing authorities' argument is that the taxpayers are not wholesalers because they consider themselves to be "cattle feeders." This argument overlooks, insofar as the taxpayers' own cattle are concerned, from what business they intend to derive a profit. They derive no profit from feeding their own cattle. It is only when that feeder steer is sold that a profit (or loss) is realized. They purchase a product which according to the testimony has no marketability for human consumption. They hold that product for between 200 and 300 days and perform certain operations on the product. Simply because they hold the product in inventory for a period of time and somehow change that product while it is in their possession does not change the nature of the business from which they ultimately hope to derive a profit. The product is then resold to a slaughterer who then sells to a retailer who sells to the ultimate consumer.

■ We realize that underlying the taxing authorities' "non-wholesalers" argument is an unarticulated concern that the taxpayers are really engaged in animal husbandry which has not traditionally been thought of in commercial terms as wholesaling. While we find nothing in the constitutional provisions which would automatically exclude any person engaging in animal husbandry from the classification of a wholesaler, we do not rest our decision that the taxpayers here are wholesalers on this ground. Rather, in our opinion, the evidence established that the taxpayers' sophisticated operation so changed and accelerated nature's basic product as to remove their business from the general classification of raising livestock. Therefore, even if we assume that an ordinary raiser of livestock could not under our constitution be classified as a "wholesaler," this assumption would still not preclude the taxpayers' operation from such classification.

We therefore hold that insofar as the taxpayers' own feeder steers are concerned, the taxpayers fall within the definition of a "person who sells tangible personal property for resale and not for consumption by the purchaser" and qualify as a wholesaler.

■ The taxing authorities next argue that if the taxpayers can be classified as wholesalers, then they are not "principally engaged" in the resale of the feeder steers. This argument is both definitional and practical. From the definitional standpoint, the argument is made that wholesaling involves only the buying and selling of inventory. Since only a small fraction of the taxpayers' time is spent in actually buying the range cattle and selling the finished steers, while the majority of the taxpayers' time is spent in putting the feeder steers into a marketable condition, the argument continues that the taxpayers are not "principally engaged" in the resale of the inventory. The attempt to create a separation between "feeding" and "selling" insofar as the taxpayers' operation is concerned is not supported by the evidence. The evidence here clearly shows that the sole end result of the taxpayers' operation was the wholesaling of the finished steers. The evidence was uncontradicted that the "feeding" operation was simply an integrated component of this end result. It would appear that the constitutional provision providing that a wholesaler's "work in process" would be exempt contemplates some activity on behalf of the

wholesaler to prepare his product for resale. The evidence clearly establishes that the "feeding" operation was simply part of this activity and could not be separated from the overall purpose of being "principally engaged" in resale of the product.

The taxing authorities' other argument that the taxpayers are not "principally engaged" in wholesaling is on a more practical level. They point to the dictionary definition of "principally" as being "in a principal manner; in the chief place or degree; primarily, chiefly, namely." They then point to the evidence that from an economic standpoint more income was derived by the taxpayers from their feedlot operations in feeding other persons' cattle than from the sale of the taxpayers' own cattle. From this premise, they argue that the taxpayers' primary or chief occupation is custom feeding cattle owned by others rather than wholesaling their own cattle.

█ This argument is the strongest of the taxing authorities' contentions. As both parties agree, what constitutes an occupation in which one is "principally engaged" is a question of fact as the word "principally" is in itself an indefinite and vague adverb. *Sutton v. Hawkeye Cas. Co.,* 138 F.2d 781 (6th Cir. 1943). It would appear to us that comparable time, effort, income, cattle units fed and the subjective intent of the persons owning the business are all material in determining whether a person is "principally engaged" in a particular activity. However, the taxing authorities' contention that economic benefit is the sole criterion upon which this issue should be resolved, is not necessarily true. The fact that an individual does not derive a profit from a given activity does not mean that individual is not principally engaged in that activity.

We therefore will review the evidence to determine whether it supports the trial court's express finding that the taxpayers are principally engaged in the wholesaling of feeder cattle.

The evidence shows that approximately 45% of the carrying capacity of the feedlot is comprised of feeder cattle owned by the taxpayers. While this number is less than 50%, the testimony shows that the limitation on the number of cattle the taxpayers could own was dictated by a line of credit limitation rather than a desire to limit the number of owned cattle. Moreover, the evidence shows that prior to 1973, the primary source of the taxpayers' income was the sale of their own cattle. The reason for the turnaround in 1973, 1974 and 1975 was a drop in the beef market which was viewed as a temporary condition. Also, the "losses" for these years were computed on the basis of the paper markup the taxpayers charged themselves for feeding the cattle— the same markup they charged other persons for feed and services.

The testimony also showed that the sole purpose for feeding other cattle at the feedlot was to lower the unit cost of feeding their own animals.

While the trial court was free to draw other conclusions from this evidence, we are not. We find that the evidence presented supports the trial court's conclusion that the taxpayers were "principally engaged" in the wholesale business.

We therefore conclude that the evidence supports the trial court's determination that the feeder steers owned by the taxpayers were exempt from taxation under Article IX, § 2 of the Arizona Constitution. Since the trial court's judgment can be affirmed on this basis, we do not determine whether the taxpayers' operation qualified them as "manufacturers" under Article IX, § 13 of the Constitution.

Judgment affirmed.

HAIRE, P. J., concurs.

EUBANK, Judge, dissenting.

I dissent. In my opinion the taxpayers are not exempt from taxes under either Art. IX, § 2 or Art. IX, § 13 of the Arizona Constitution, 1 A.R.S.

ARTICLE IX, § 2

It is necessary to determine the intention of the electorate when they amended Art.

IX, § 2 by Initiative Petition # 102 at the General Election held on November 3, 1964. Their intent is construed at the time of the enactment, *Bushnell v. Superior Court*, 102 Ariz. 309, 428 P.2d 987 (1967), and subsequent changes in the law or conditions should not be considered. *Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co.*, 39 Ariz. 65, 77, 4 P.2d 369, 374 (1931), *modified*, 39 Ariz. 367, 7 P.2d 254 (1932).

The Publicity Pamphlet 1964, published by the Secretary of State pursuant to A.R.S. §§ 19–123, 124, contains the following information:

1. THE TITLE:

    PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA RELATING TO TAXATION AND EXEMPTIONS FROM TAXATION; PROVIDING THAT INVENTORIES SHALL BE EXEMPT FROM TAXATION; AMENDING ARTICLE IX, SECTION 2 OF THE CONSTITUTION OF ARIZONA.

2. THE CONTEXT:

    Section 2. TAX EXEMPTIONS. There shall be exempt from taxation all federal, state, county and municipal property. Property of educational, charitable and religious associations or institutions not used or held for profit may be exempt from taxation by law. Public debts, as evidenced by the bonds of Arizona, its counties, municipalities, or other subdivisions, shall also be exempt from taxation. STOCKS OF RAW OR FINISHED MATERIALS, UNASSEMBLED PARTS, WORK IN PROCESS OR FINISHED PRODUCTS CONSTITUTING THE INVENTORY OF A RETAILER OR WHOLESALER LOCATED WITHIN THE STATE AND PRINCIPALLY ENGAGED IN THE RESALE OF SUCH MATERIALS, PARTS OR PRODUCTS, WHETHER OR NOT FOR RESALE TO THE ULTIMATE CONSUMER SHALL BE EXEMPT FROM TAXATION. There shall be further exempt from taxation the property of widows, honorably discharged soldiers, sailors, United States marines, members of revenue marine service, nurse corps, or of the components of auxiliaries of any thereof, residents of this state, not exceeding the amount of two thousand dollars, where the total assessment of such widow and such other persons named herein does not exceed $5,000.00; provided, that no such exemption shall be made for such persons other than widows unless they shall have served at least sixty days in the military or naval service of the United States during time of war, and shall have been residents of this state prior to September 1, 1945. All property in the state not exempt under the laws of the United States or under this constitution, or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law. This section shall be self-executing.

3. THE ONLY PUBLISHED ARGUMENT:

    If you want greater security for present workers, greater industrial growth, more jobs for Arizona people and higher wages in Arizona vote "Yes" on initiative # 102.

    Initiative # 102 is designed solely and simply to eliminate the inventory tax of raw materials, work in process, and finished products on Arizona retailers and wholesalers. A "Yes" vote on proposition # 102 means more warehousing and industrial growth in our state and will provide more jobs for more Arizona people. This tax shuts industries out of Arizona which otherwise would locate here. Such industries would pay taxes on machinery, equipment, buildings, real estate, state income taxes and sales taxes. A "Yes" vote will not pass on any additional tax to small home owners of Arizona. In fact, the only way to reduce the tax burden of small home owners and increase the state's general tax fund is to bring more business into Arizona and insure new sources of tax revenue. In-

sure more jobs for the people of Arizona and more industrial growth by voting "Yes" on # 102.

SPONSORED BY: Small Business Association, Juanita B. Ames, President; Allen A. Jones, Executive Secretary.

4. THE SUMMARY OF 102 WHICH APPEARED ON THE BALLOT:

AN AMENDMENT EXEMPTING FROM TAXATION, IN ADDITION TO EXEMPTIONS PRESENTLY MADE BY ARTICLE IX, SECTION 2, INVENTORIES OF RAW OR FINISHED MATERIALS, UNASSEMBLED PARTS, WORK IN PROCESS OR FINISHED PRODUCTS OF ARIZONA RETAILERS AND WHOLESALERS PRINCIPALLY ENGAGED IN THE RESALE THEREOF WHETHER TO THE ULTIMATE CONSUMER OR NOT.

Nothing I read in Initiative Petition # 102 or in the Publicity Pamphlet indicates an intention on the part of the electorate to include the agriculture pursuits of farming and cattle raising within the tax exemption. The plain and ordinary meaning of the exemption language should be limited to the inventories of wholesalers and retailers and not extended to growing crops before harvest or the raising of cattle, hogs, sheep, chickens, etc., before they are slaughtered. Historically, in Arizona we have recognized this difference. Range livestock is listed on the tax roll and taxed as a part of the real property, while transient livestock is assessed as the personal property of the taxpayer. (A.R.S. §§ 42–234, 235; Class Four Tax Classification—A.R.S. § 42–136(A)(4)). The slaughter of animals and warehousing of the meat has been regulated since territorial days (A.R.S. § 24–601 et seq.). *Tovrea Packing Co. v. The Livestock Sanitary Board*, 44 Ariz. 151, 34 P.2d 420 (1934); *Territory v. Kenney*, 11 Ariz. 353, 95 P. 93 (1908). The arguments made here by the taxpayers and accepted

by the majority, merely reflect the scientific revolution that has occurred throughout all agriculture since World War II. New techniques and methods have increased production in all aspects of agriculture, but this is not a valid basis for granting a tax exemption to the taxpayers. The same arguments made by the taxpayers here can equally be made by the cotton grower, chicken raiser, lettuce farmer, and sunflower seed raiser.[1]

The general rule is that the interpretation of a tax exemption shall be strictly construed against granting the tax exemption. *Kunes v. Samaritan Health Service*, 121 Ariz. 413, 590 P.2d 1359 (1979); *Wenner v. Dayton-Hudson Corp.*, 123 Ariz. 203, 598 P.2d 1022 (App.1979). This rule is especially important where an initiative exemption is involved, since it is drafted and proposed by those special interests desiring a tax exemption. Applying the rule here, where as I believe the legislative intent was not to include growing crops, livestock or fowl, the taxpayers should be denied relief.

### ARTICLE IX, § 13

Although the majority does not deem it necessary to discuss the taxpayers' claim to a "manufacturer's" exemption under Art. IX, § 13 of the Arizona Constitution, I do. I agree with the appellants that no tax exemption is available to appellees by this section.

Article IX, § 13 came into the constitution as a legislative referendum. House Concurrent Resolution No. 6, 1950 Ariz. Sess.Laws, 1st S.S., filed with the Secretary of State on March 20, 1950 reads:

PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA RELATING TO PUBLIC DEBT, REVENUE AND TAXATION.

Be it resolved by the House of Representatives of the State of Arizona, the Senate concurring:

1. The following amendment to Article IX, constitution of Arizona, relating

---

**1.** Technicalities in the cattle raising can be fully appreciated by reading *Martinez v. Territory*, 5 Ariz. 55, 44 P. 1089 (1896) where an indictment charging the defendant with stealing a steer was held to be in fatal variance when the proof showed he stole a cow.

to public debt, revenue and taxation, is proposed, to become valid as a part of the constitution and of Article IX thereof, when approved by a majority of the qualified electors voting thereon and upon proclamation of the governor:

> No tax shall be levied on raw or unfinished materials, unassembled parts, work in process or finished products, constituting the inventory of a manufacturer or manufacturing establishment located within the state and principally engaged in the fabrication, production and manufacture of products, wares and articles for use, from raw or prepared materials, imparting thereto new forms, qualities, properties and combinations, which materials, parts, work in process or finished products are not consigned or billed to any other party.

This provision was adopted by the voters on September 12, 1950. Its purpose as stated in the Publicity Pamphlet issued by the Secretary of State is ". . . solely and simply to eliminate the inventory tax on raw materials, work in process, and finished products of Arizona manufacturers . . ." in order to encourage ". . . greater industrial development in our state and . . . provide more jobs for more Arizona people."

The intent of Art. IX, § 13 was construed by our supreme court in *County of Apache v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 376 P.2d 854 (1962) to include lumber mills and lumber products within the definition of manufacturer and manufactured products. The court said:

> The appellant, however, contends that the appellee has failed to show itself within the provision of the constitution which grants the tax exemption, since it does not impart to its products " * * * new forms, qualities, properties and combinations * * * " as required by the definition of the constitutional amendment. The county admits that standing timber is converted into new forms by the milling process, but denies that the process imparts new qualities, properties and combinations. We will assume *but do not*

*decide* that the provision speaks of these attributes in the conjunctive, as the appellant asserts, and that a change in each must be shown before a product is "manufactured."

> ▮▮▮ "Qualities" and "properties" are synonymous terms meaning attributes or characteristics. In size, shape, appearance, texture, utility and perhaps composition a board differs from the standing tree. As to "combination," the undisputed evidence showed that the kiln drying process used by appellee involves the addition of moisture by surrounding the lumber with live steam, followed by a controlled extraction of moisture to a uniform level by means of heat. Thereafter, a waxy substance is applied to the ends of each piece of lumber to prevent moisture loss. We hold that this process results in a new "combination" of materials within the meaning of the constitutional provision. [Emphasis in original].

92 Ariz. at 327, 328, 376 P.2d at 856–7. Thus the court distinguished between the mere growing of trees (forestry) and the process of converting them into lumber and various lumber products (manufacturing). The same distinction should be made as between growing trees, and raising crops, livestock and foul (farming). The slaughtering of livestock with the resultant conversion of steers into meat products, and the conversion of trees into lumber and lumber products results in manufactured products. *Id.*

Other jurisdictions have insisted on a substantial change in the processed item in order for it to be deemed manufactured. Thus, the removal of plastic from wire or cable was not "manufacturing" for tax exemption purposes in *Eastern Diversified Metals Corp. v. Commonwealth,* 6 Pa. Cmwlth. 605, 297 A.2d 167, *aff'd* 453 Pa. 611, 306 A.2d 300 (1973). "A superficial change in the original materials without any substantial and well-signalized transformation in form" is not a new article or new product included within the manufacturing definition qualifying manufacturing for tax exemption. *Commonwealth v. Perfect Photo, Inc.,* 29 Pa.Cmwlth. 316, 371

A.2d 580 (1977). "A process which involves a material having commercial value for its intended use, that merely upgrades the material so as to increase the value obviously would not be manufacturing". *Department of Revenue v. Allied Drum Service,* 561 S.W.2d 323, 326 (Ky.1978). (*Allied* contains an excellent analysis of the problem involving a number of cases and factual situations).

In the case *sub judice,* after the cattle are injected, or after they ingest a variety of hormones, minerals and vitamins, and undergo other treatment, the end product still remains exactly what it was in the beginning—a steer. True, the steers are bigger and better, but they are still steers. (See footnote 1).

The intent of the legislature and electorate did not, in my opinion, intend to extend an exemption to the agricultural pursuits of tree farming, land farming, or cattle raising by the enactment of Art. IX, § 13.

For the reasons stated above and under the prior discussion of Art. IX, § 2, I would deny the taxpayers their claimed exemption and reverse the trial court's judgment.